# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION
## AT GREENEVILLE

| | | |
|---|---|---|
| MARTY B. PACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| COCKE COUNTY, Tennessee, | ) | Jury of Twelve Demanded |
| a governmental entity; | ) | |
| CJ BALL, Sheriff of Cocke | ) | |
| County, Tennessee, individually; | ) | |
| JOSHUA R. HARTSELL, Cocke County | ) | |
| Chief of Corrections, individually; | ) | |
| SGT. DAVID KIRKLAND, individually; | ) | |
| MELODI JOY BOCOCKE, individually; | ) | |
| WILL BROYLES, individually; and | ) | |
| JOHN and JANE DOES 1-5, individually, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## CLASS ACTION COMPLAINT
_____

Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: 865-200-4117
lance@lbakerlawfirm.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

I.      NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Snapshot of the Cocke County Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      Marty B. Pack Is Booked Into the Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.      Two Known Violent Inmates Lie in Wait for Plaintiff. . . . . . . . . . . . . . . . 13

        D.      Plaintiff Is Brutally Assaulted By Inmates Webster and Moss . . . . . . . . . . . . . 13

        E.      Knowing They Had Placed Plaintiff in a Dangerous Situation, Corrections
                Officers Still Failed to Monitor the Real-Time 3 Cell Video . . . . . . . . . . . . . . . 15

        F.      Sgt. Kirkland's Warning Implies Inmate Webster Was Involved in Previous
                Assaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        G.      Sgt. Kirkland's Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        H.      Plaintiff Air-lifted to UTMC for High Level Trauma Care . . . . . . . . . . . . . . . 18

        I.      Failures to Classify and Segregate Violent From Non-Violent Inmates . . . . . . . 18

        J.      The Moving Force Behind Plaintiff's Beating: Unsafe Jail Conditions,
                Antiquated Facilities, Overcrowding, Under-staffing, an Inadequate
                Classification System, and Unqualified Officers . . . . . . . . . . . . . . . . . . . . . . . 21

        K.      Failed State Inspections and Decertification . . . . . . . . . . . . . . . . . . . . . . . . . 24

        L.      Correction Officer Corruption, Civil Rights Cases, Inmate-on-Inmate
                Assaults . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        M.      Real World Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

N.      Circumstances Require Discovery to Permit Plaintiff to More Precisely
        Allege His Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.      CLASS ACTION ALLEGATIONS
        (Against Cocke County, Sheriff Ball, and Chief Hartsell) . . . . . . . . . . . . . . . . . . . . . . . 30

VI.     WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VII.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        Count One – Violation of 42 U.S.C. § 1983 – Failure to Protect
        Under the Fourteenth Amendment to the United States Constitution
        (Against Sheriff Ball and Chief Hartsell, individually) . . . . . . . . . . . . . . . . . . . 32

        Count Two – Violation of 42 U.S.C. § 1983 – Failure to Protect
        Under the Fourteenth Amendment to the United States Constitution
        (Against Officer Bococke, Sgt. Kirkland, and Officer Broyles,
        individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        Count Three – Violation of 42 U.S.C. § 1983 – Deliberate
        Indifference to Safety of Pretrial Detainees Under the Fourteenth
        Amendment to the United States Constitution (Municipal Liability)
        (Against Cocke County) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        Count Four – Violation of 42 U.S.C. § 1983 – Failure to Train
        (Against Cocke County, Sheriff Ball and Chief Hartsell, individually)
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        Count Five – Negligence (Against Officer Bococke, Sgt. Kirkland,
        and Officer Broyles, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

        Count Six – Reckless Infliction of Emotional Distress (Against Sgt.
        Kirkland, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VIII.   PUNITIVE DAMAGES (Against Sgt. Kirkland). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IX.     JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

X.      PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**COMES** Marty B. Pack ("Plaintiff") and files this Complaint against the Defendants: Cocke County, Tennessee ("the County"), CJ Ball, Sheriff of Cocke County, Tennessee, individually; Joshua R. Hartsell, Cocke County Jail Administrator, individually; Sgt. David Kirkland, individually; Officer Melodi Joy Bococke, individually; Officer Will Broyles, individually; and John and Jane Does 1-5, individually ("the Doe Defendants")(collectively, "Defendants").

## I. NATURE OF ACTION

*"[I]t is unsafe for inmates. . . ."*[1]

*"In addition due to the overcrowded conditions, the number for inmate assaults are rising with a contributing factor being the facility's inability to properly classify inmates, placing both inmates and officers at increased risk for harm."*[2]

1.      This is a civil rights action brought by Marty B. Pack ("Plaintiff"), individually, and on behalf of others similarly situated, against Cocke County ("the County"), Sheriff CJ Ball ("Sheriff Ball"), Chief of Corrections Josh Hartsell ("Chief Hartsell"), and several individual Corrections Officers, including a supervisor, Sgt. David Kirkland ("Sgt. Kirkland"), Officer Melodi Bococke ("Officer Bococke"), and Officer Will Broyles ("Officer Broyles") (collectively, "the Individual Officers"), for violations of civil rights guaranteed under the Fourteenth Amendment to the United States Constitution ("U.S. Const. amend. XIV") and Tennessee common law.

2.      Plaintiff, arrested for DUI, was booked into the Cocke County Jail ("the Jail") by Officer Bococke, who was initially responsible for handling Plaintiff's intake and for classifying him

---

[1]Former Cocke County Mayor Ottinger, speaking on September 7, 2017, about why the Tennessee Corrections Institute's review committee indicated that the Jail was not re-certified.

[2]*See* Nov. 1, 2019 TCI Re-inspection Report, commenting about why certification of the Jail was not recommended.

-1-

to make an appropriate cell-assignment. Bococke recognized, as did Sgt. Kirkland and Officer Broyles, that Plaintiff was not only intoxicated, but also disabled, and noted Plaintiff was charged with a non-violent offense.

3.      Sgt. Kirkland and Officers Bococke assigned Plaintiff to 3 Cell, where he would be housed with multiple known violent offenders, including Clyde Webster and Joshua Moss. Sgt. Kirkland knew very well that Webster was a violent troublemaker who had previously been involved in inmate assaults. At Sgt. Kirkland's direction, Officer Broyles escorted Plaintiff to 3 Cell and let him inside. Broyles then walked away, even though he heard a commotion coming from inside 3 Cell.

4.      Within minutes of Plaintiff having arrived in 3 Cell, Inmates Webster and Moss, who were known by Sgt. Kirkland to prey on vulnerable inmates, began yelling at and threatening Plaintiff. Officer Bococke, walking down the hallway outside 3 Cell, overheard the commotion inside 3 Cell, hesitated a couple of times as she passed by, as if to listen, but she kept on walking. At that very moment, Inmates Webster and Moss were preparing to pounce on the helpless Plaintiff and within a few seconds, had savagely beaten and battered him about the head and face.

5.      Although real-time video surveillance of 3 Cell was available for monitoring by Corrections Officers from their posts in the Jail control room, neither Sgt. Kirkland nor the Officers under his supervision bothered to check the monitors. If they had, they would have seen – and heard – the entire incident and assault unfold before their eyes. Instead, they did nothing.

6.      During the brutal assault, Plaintiff received no fewer than thirty-eight (38) blows to the head and face, suffering severe eye and facial trauma and severe bruising of the neck, chest, and arm. He was taken via ambulance to Newport Medical Center, then airlifted by a Lifestar helicopter to the University of Tennessee Medical Center ("UTMC") in Knoxville.

7.      This Complaint centers upon Cocke County's re-occurring system-wide failure to protect the safety of pretrial detainees at the Jail,[3] and the deliberate indifference or reckless disregard to the obvious, recurring, and unjustifiably high risk of harm demonstrated by the County, Sheriff Ball, Chief Hartsell, and Sgt. Kirkland and Officers Bococke and Broyles.

8.      Based upon public statements of former Sheriff Fontes, former Mayor Ottinger, and other County officials, Tennessee Corrections Institute ("TCI")[4] official inspections and re-inspection reports, media reports, and past and pending civil rights actions involving similar inmate-on-inmate assaults, violence among inmates at the Jail has increased at an alarming rate. Since 2012, thousands of inmates have been – and continue to be – subjected to dangerously unsafe Jail conditions (including overcrowding, understaffing, and the abject failure to classify pretrial detainees, particularly pretrial detainees, in any serious manner to protect non-violent, intoxicated, disabled, or otherwise vulnerable pretrial detainees, particularly pretrial detainees, from hardened violent inmates).

9.      After years of increasing inmate violence and more than a decade of bi-annual state reports describing the Jail as chronically unsafe for pretrial detainees, the County, Sheriff Ball, and

---

[3]The Cocke County Jail consists of two separate facilities, the Old Jail and the Jail Annex. Plaintiff refers to both facilities collectively as "the Jail."

[4]Under the authority of Tenn. Code Ann. § 41-4-140, the TCI is required to establish minimum standards for adult local jails, lock-ups, workhouses and detention facilities in the state.

Chief Hartsell have taken no meaningful action to mitigate, much less alleviate, the root cause of the rampant violence: unsafe Jail conditions, including severe overcrowding, under-staffing, and the lack of a classification system.

10.     Official state data shows that, for years, the Jail has been *the second most crowded jail in Tennessee*. It is understaffed, lacking sufficient manpower to supervise inmates. Historically, Jail officials have made no meaningful effort to separate violent offenders from non-violent ones, much less segregate intoxicated or disabled pretrial detainees from violent inmates. In this case, the reckless disregard to obvious and known safety risks led directly to Plaintiff being viciously beaten.

11.     By July 2, 2023, when Plaintiff was booked, the County, Sheriff Ball, and Chief Hartsell knew that the Jail had been decertified by the TCI[5] in 2017 "after two years of failed inspections and warnings about lax employee training, staffing shortages, inadequate medical care and safety violations[.]"[6] It has never regained certification. Most of the deficiencies relate to "gross overcrowding" and "under-staffing." Sheriff Ball's predecessor, former Sheriff Fontes, long conceded that such conditions pose a "serious risk of safety, and a serious liability for the County."[7]

12.     When Plaintiff was booked, the Jail had exceeded its 120-person maximum capacity for no fewer than **twelve consecutive years**, mostly hovering at between *150% and 310% beyond*

---

[5]The TCI's Board of Control establishes the standards to inspect and certify local correctional facilities.  Inspections and re-inspections are conducted within the mandated time-frame to ensure compliance of all standards for the purpose of certification.

[6]"*Cocke County Loses Jail Certification*," Knox News, Oct. 4, 2017, https://www.knoxnews.com/story/news/crime/2017/10/04/cocke-county-loses-jail-certificationga rners-lawsuit-over-32-year-old-inmates-death/725437001/ (last accessed May 11, 2024).

[7]"*Sheriff: Cocke Co. Jail is 'Inhumane,' Poses 'Serious Risk to Safety*," WBIR News, Feb. 12, 2020, available at https://www.wbir.com/article/news/local/ sheriff-cocke-co-jail-is-inhumane-poses-a-serious-risk-tosafety/ (last accessed May 11, 2024).

-4-

*capacity*.[8] Former Sheriff Fontes and other County officials have admitted that these conditions – particularly the chronic overcrowding – are responsible for the increasing number of inmate-on-inmate assaults. Yet, Sheriff Ball, Fontes, Mayor Ottinger, Chief Hartsell, and other County officials have still taken no meaningful action to address the deplorable conditions.[9] As a result, by the time Plaintiff was booked in July 2, 2023, inmate-on-inmate violence at the Jail was rampant. His fate was sealed when he was assigned to a cell housing two violent inmates.

13.     The assault – like assaults on hundreds of other pretrial detainees over the past thirteen years – was the foreseeable result of longstanding policies or customs of deliberate indifference and reckless disregard to obvious and serious risks to inmate safety.

14.     Plaintiff alleges the following claims:

■ Count One – Violation of 42 U.S.C. § 1983 – Failure to Protect Under the Fourteenth Amendment to the United States Constitution (Against Sheriff Ball and Chief Hartsell, individually);

■ Count Two – Violation of 42 U.S.C. § 1983 – Failure to Protect Under the Fourteenth Amendment to the United States Constitution (Against Sgt. Kirkland and Officers Bococke and Broyles, All Individually);

■ Count Three – Violation of 42 U.S.C. § 1983 – Policy, Custom, or Practice of Failing to Protect Pretrial Detainees Under the Fourteenth Amendment to the United States Constitution (Municipal Liability) (Against Cocke County);

---

[8]In fact, summary report-data provided by the TCI indicates that since 2011, only one Tennessee county (Van Buren) has consistently had a larger overcapacity percentage of inmates in its jail than Cocke County. *See* historical TCI Jail Summary Reports https://www.tn.gov/correction/statistics-and-information/jail-summary-reports.html.

[9]*See "Overcrowding Breeds Ugly Fights Inside Cocke County Jail*," WVLT TV, Jan. 31, 2020, available at https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail567474631.html (last accessed April 30, 2024) (Sheriff Fontes: "This is not a new issue – it's been here along time.").

■ Count Four – Failure to Train Corrections Officers to Protect Pretrial Detainees From Violence (Against Cocke County, Sheriff Ball, and Chief Hartsell, Individually);

■ Count Five – Negligence and/or Gross Negligence (Against Sgt. Kirkland and Officers Bococke and Broyles, All Individually); and

■ Count Six – Reckless Infliction of Emotional Distress (Against Sgt. Kirkland, Individually).

15.     Plaintiff requests compensatory, punitive damages, attorneys' fees, costs, expenses, and all other available and appropriate relief.

## II. JURISDICTION AND VENUE

16.     This action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourteenth Amendments of the United States Constitution, and for violations of Tennessee common law. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

17.     This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Cocke County, within the Northeastern Division of the Eastern District of Tennessee.

-6-

### III. PARTIES

**A.    Plaintiff**

19.    At all times material, Marty B. Pack ("Plaintiff") was a citizen and resident of Cocke County. Plaintiff was a pretrial detainee at the time of the incident at the Cocke County Jail, having been arrested and charged with second offense DUI.

**B.    Defendants**

20.    Cocke County, Tennessee ("the County") is a governmental entity and political subdivision of the State of Tennessee, duly organized, which funds and maintains the Cocke County Jail and employs corrections officers and others who work there. The County, as a local government, is a public entity in accordance with 42 U.S.C. § 12131(1) and 42 U.S.C. § 12111(5). The County, upon information and belief, is also a recipient of federal financial assistance as required under 29 U.S.C. § 794.

21.    The County owns the Jail, located in Newport, Tennessee. The County is responsible for, among other things, providing adequate funding for the operation of the Jail, including funding for training the Sheriff, the Sheriff's employees, and corrections officers, and funding to allow for adequate staffing and training of the Jail. It may be served through its chief executive officer, County Mayor Rob Mathis, at the Cocke County Courthouse, 360 East Main Street, Newport, TN 37821.

22.    The County possesses the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment and removal of individual members of the Cocke County Sheriff's Office ("CCSO"), and to assure that said actions, policies, rules, regulations, practices and procedures of the CCSO

-7-

and its employees and agents comply with the laws and constitutions of the United States and of the State of Tennessee.

23. The County and the CCSO are answerable for the safekeeping of persons in their custody and responsible for all matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees.

24. At all times relevant to this Complaint, Sheriff CJ Ball ("Sheriff Ball") was the duly-elected Sheriff of Cocke County. Ball was hired by former Sheriff D.C. Ramsey in 2001 as a corrections officer. He was later promoted to patrol deputy in 2004. He also held the rank of patrol sergeant, patrol lieutenant, detective lieutenant, training officer, general departmental instructor, and administrative captain, before becoming chief deputy to former Sheriff Fontes. He was elected Sheriff in 2022.

25. Sheriff Ball was statutorily responsible for the screening, hiring, firing, training and the supervision of CCSO personnel; and responsible for the safety and welfare of those in his custody. Specifically, Sheriff Ball was responsible for operating the Jail and overseeing Jail operations. That responsibility includes, but is not limited to, supervising Corrections Officers, who serve at his will in their respective positions at the Jail, and providing adequate staffing at the Jail.

26. Sheriff Ball is the proper party to be sued under 42 U.S.C. §1983. He is sued in his individual capacity and as principal on his official bond. Ball was operating under color of law. He is a "policymaker" within the meaning of that term as applied by the Supreme Court in *Pembauer v. City of Cincinnati*, 479 U.S. 469 (1986), and as the official head of a "public entity" providing services, programs, or activities. Sheriff Ball is, upon information and belief, a citizen and resident of Cocke County and may be served with process at his residence in Cocke County, Tennessee.

-8-

27.     At all times relevant to this Complaint, Defendant, Joshua R. Hartsell ("Chief Hartsell"), was employed by the CCSO as Chief of Corrections, a position to which he was appointed by former Sheriff Fontes. Chief Hartsell acted with the authority invested in him by virtue of his employment with the County, and is also a state actor under § 1983. As a supervisor at the Jail, Chief Hartsell's responsibilities include, but are not limited to, providing sufficient training to Jail employees, including corrections officers, and creating and implementing adequate polices and procedures to ensure that inmates, particularly pretrial detainees, are safe. At all relevant times, Chief Hartsell was jointly responsible with Sheriff Ball for the management of the Jail.

28.     Chief Hartsell is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Chief Hartsell is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

29.     At all times relevant to this Complaint, Defendant Officer Melodi Joy Bococke, individually ("Officer Bococke"), was employed by the CCSO as a corrections officer. She is sued in her individual capacity and as principal on her official bond. She was operating under color of law. Officer Bococke is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

30.     At all times relevant to this Complaint, Defendant Sgt. David Kirkland, individually ("Sgt. Kirkland"), was employed by the CCSO as a corrections officer. He is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Sgt. Kirkland is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

-9-

31.     At all times relevant to this Complaint, Defendant Officer Will Broyles, individually ("Officer Broyles"), was employed by the CCSO as a corrections officer. He is sued in his individual capacity and as principal on his official bond. He was operating under color of law. Officer Broyles is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

32.     Various persons or entities not made Defendants in this lawsuit, including but not limited to County officials or CCSO officials or employees, have participated with Defendants in the violations asserted in this Complaint and have performed acts and made statements in furtherance thereof. These Doe Defendants have not yet been identified with such precision that they may be named as Defendants in this suit, but may be named by amendment when known.

## IV.   FACTUAL ALLEGATIONS

### A.     Snapshot of the Cocke County Jail

33.     Cocke County currently operates two separate jails. The Old Jail, the facility housing female inmates, is located above the Courthouse. The Jail Annex, which houses male inmates, is located about 400 feet across Main Street.[10]

34.     According to TCI reports and former Sheriff Fontes, the Jail has enough room for about 142 inmates. The CCSO's website states that the Jail has an average daily population of 165. On most days, however, TCI reports indicate that the Jail houses over 200 inmates, many forced to sleep on the floor. Since July 2012, the average daily population has far exceeded its design capacity.

---

[10]*See "Sheriff: Cocke Co. Jail Is 'Inhumane,' Poses a 'Serious Risk to Safety'"* https://www.13wmaz.com/article/news/local/sheriff-cocke-co-jail-is-inhumane-poses-a-serious-risk-to-safety/51-e59b4b4a-fc84-4314-9580-a0315c3a172f

-10-

35.     The Jail has failed every TCI inspection and re-inspection since 2017. Data from the TCI indicates that, as of July 31, 2023, the month Plaintiff was booked, there were 136 inmates at the Jail, with beds for just 120, leaving 16 inmates to sleep on the floor.

**B.      Marty B. Pack Is Booked Into the Jail**

36.     On July 2, 2023, 61-year old Marty B. Pack ("Plaintiff"), a disabled Hartford, Tennessee resident, was arrested by CCSO deputies on second offense DUI charges. He was booked into the Jail at approximately 10:38 p.m. According to Sgt. Kirkland, Plaintiff's behavior during the intake process was "positive and easy going. He seemed to be in good spirits while answering intake questions." Sgt. Kirkland wrote in his report that Plaintiff "was not combative, answered each question willingly, and was very cooperative."

37.     Corrections Officer Melodi Joy Bococke took Plaintiff through the intake or booking process, questioning him and completing various intake forms, including a medical intake form, where she noted that Plaintiff was intoxicated and also suffered from a serious liver disease. She also completed a "Booking Officer Checklist," within which she checked a box labeled "classify." The intake process was completed at approximately 11:37 p.m. and Officer Bococke signed the various forms, which were then approved by Sgt. Kirkland.

38.     In his report, Sgt. Kirkland states that he informed Officer Broyles to place inmate Plaintiff "in 3 Cell due to 3 Holding being fully populated, 2 Holding being occupied with a medical, and 1 Holding being female intakes." As directed, Officer Broyles escorted Plaintiff to 3 Cell.

39.    A hallway video camera ("Hall Video")[11] captures Officer Broyles, carrying bedding and toiletries, as he escorted Plaintiff to 3 Cell. [Hall Video, 0:06]. At 0:28 of the video, Officer Broyles and Plaintiff reach 3 Cell, and Officer Broyles hands Plaintiff the bedding and toiletries. [Hall Video, 0:28].

40.    At 0:39 of the Hall Video, Officer Broyles opened the cell door. By 0:50, Plaintiff has entered the cell. Officer Broyles closed the door and walked back down the hallway toward the control room. [Hall Video, 0:50]. At 0:58, a voice is heard on the audio portion of the video, again, seconds before the events depicted. It may be Officer Broyles' voice, or someone else's voice, but Officer Broyles turned around and walked back down to 3 Cell. [Hall Video, 0:58]. At 1:05, Officer Broyles opened the small door to the door viewing window and watched for about eight seconds, before finally shutting the small door and walking back down the hallway toward the control room. [Hall Video, 1:05].

41.    At 1:17 on the Hall Video, the delayed audio indicates that Officer Broyles said, "good to go," when he opened the peephole door before walking away. [Hall Video, 1:17].

42.    By 1:30 of the Hall Video, Officer Broyles had walked to the far end of the hallway and then disappeared to the left side.  [Hall Video, 1:30].

43.    At 00:36 of the 3 Cell Video, Plaintiff entered the cell and toilet area of 3 Cell carrying the items Officer Broyles had given to him. [3 Cell Video, 00:36].

_____

[11]There is at least one video recording of the assault and at least one video of related events. The 3 Cell Video depicts most of the assault. The Hall Video depicts officers and events in the Hallway adjacent to and outside of 3 Cell immediately preceding, during, and immediately following the assault. The audio on both video recordings lags several seconds behind what is actually being depicted in the videos. This is how the recordings were produced and Plaintiff has taken no actions to synchronize the audio and video on the recordings.

44.     At 00:44 of the 3 Cell Video, Plaintiff placed the items atop a short privacy wall and walks toward the toilet. [3 Cell Video, 00:38].

### C.     Two Known Violent Inmates Lie in Wait for Plaintiff.

45.     At 1:01 of the 3 Cell Video, Plaintiff is at the toilet, preparing to pull his pants down; a shirtless bald-headed inmate with a beard wearing striped jail shorts – later identified as Joshua Moss ("Moss") – can be seen walking into the toilet area, followed quickly by another inmate, later identified as Clyde Webster ("Inmate Webster"), just a few feet away from Plaintiff. [3 Cell Video, 01:01].

46.     At 1:09, Moss walked past Plaintiff as he sat on the toilet and gestured toward him, appearing to mouth something to Plaintiff, who appeared to respond. [3 Cell Video, 01:09].

47.     By 1:15 of the 3 Cell Video, Webster and Moss had walked back toward the bunk area and positioned themselves to block Plaintiff's exit. By 1:20, the two men are waiting in the dark for Plaintiff to get off the toilet. [3 Cell Video, 01:15-1:32].

48.     At 1:39 of the 3 Cell Video, Plaintiff got up from the toilet, pulled his pants up, and muttered something for about twenty seconds. Webster or Moss says something to Plaintiff, who responded. Plaintiff then walked away from the toilet and the three men have a brief muffled conversation for about thirty seconds. [3 Cell Video, 1:39-2:15].

### D.     Plaintiff Is Brutally Assaulted By Inmates Webster and Moss.

49.     At 2:18, Webster and Moss approached Plaintiff aggressively, with Moss in the lead. Moss punched towards Plaintiff's face with his left fist, and both Moss and Webster started punching Plaintiff about the head and face. By 2:22, Plaintiff had disappeared from view, but both Webster and Moss continue to punch him about the head and face. Moss held Plaintiff with his right

-13-

hand and repeatedly punched him with his left fist, while Webster grabbed hold of Plaintiff and repeatedly punched him in the head and face with both fists. [3 Cell Video, 02:18-2:32].

50.     The attack continued for about fourteen (14) seconds, until 2:32, when Webster and Moss start walking away. [3 Cell Video, 02:32].[12]

51.     The audio of the actual attack cannot be heard on the 3 Cell Video recording until 2:37, at which time the blows by Webster and Moss can be heard as they land on Plaintiff's face and head, as Plaintiff is heard groaning. [3 Cell Video, 02:37].

52.     In all, Plaintiff was punched no fewer than thirty-eight (38) times in the head and face by Inmates Webster and Moss over the course of about fourteen (14) seconds.

53.     At 3:08 of the Hall Video, a male officer with a beard – presumably Sgt. Kirkland – turned the corner at the end of the hallway and headed toward 3 Cell. [Hall Video, 3:08].

54.     At 3:13, audio picked up the sound of Sgt. Kirkland as he entered the cell. [3 Cell Video, 3:13]. Beginning at 3:22 of the Hall Video, Sgt. Kirkland is seen opening the door to 3 Cell and looking in for about eleven seconds, before Plaintiff emerges and steps out into the hallway, his back to the camera. [Hall Video, 3:22].

55.     At 3:37 of the Hall Video, one inmate said, "get this motherfucker out of here. Come in here and call me a bitch and every damn thing." [Hall Video, 3:37].

---

[12]At 1:59 of the Hall Video, a female officer with long dark hair – presumably Officer Bococke – comes into view and walks down the hallway toward 3 Cell and passes by the door, briefly hesitating between 2:09 – 2:13, as if listening to something. The delayed audio indicates that as Officer Bococke passed by, she heard voices from inside the cell. At 2:30 of the Hall Video recording, Plaintiff can be heard inside 3 Cell saying, "Fuck you," apparently to Webster and Moss, who laid in wait to attack Plaintiff. At 2:40 of the Hall Video, a commotion can be heard from the cell, as the attack on Plaintiff had begun. By 3:03, the commotion ends, as the inmates are heard yelling at Plaintiff. [Hall Video, 1:59-3:03].

-14-

56.     At 3:55 of the Hall Video, Sgt. Kirkland told Plaintiff to "walk up out to control" and is heard telling one of the inmates (later identified as Webster) to put his hands behind his back. [Hall Video, 3:55].

57.     At 3:34 of the 3 Cell Video, Sgt. Kirkland walked into the cell and had a conversation with Webster, who turned around with his back to Kirkland, allowing Kirkland to handcuff him. [3 Cell Video, 3:34].

58.     At 4:24 of the Hall Video, as the audio continues to lag a few seconds behind the video, Sgt. Kirkland told the handcuffed Webster to "step out" (this is about nine or ten seconds behind what the video is then depicting). [Hall Video, 04:24].

59.     At 3:59, Sgt. Kirkland led Webster out of 3 Cell in handcuffs, as Moss walked back toward the interior of 3 Cell and away from the toilet area. [3 Cell Video. 3:59]. Sgt. Kirkland said, "I know. I'm gonna figure this out. I'm investigating this . . . ." At 4:29, the cell door closed. [3 Cell Video, 04:29].

60.     At 4:17 of the Hall Video, Sgt. Kirkland turned to face Inmate Webster and by 4:30, is arguing with Webster. [Hall Video, 4:17-4:30]. The delayed audio indicates that Webster said something akin to, "come in there cussing me up one way and down the other, he gets what he gets . . . ."

**E.    Knowing They Had Placed Plaintiff in a Dangerous Situation, Corrections Officers Still Failed to Monitor the Real-Time 3 Cell Video.**

61.     3 Cell has a video camera near the door where Plaintiff entered the cell. The camera-view spans the entire area near the toilet where in the assault occurred, and also contains audio. It offers a real-time view of the area. This way, this particular portion of 3 Cell can be easily monitored by Corrections Officers in the Control Room at the Jail.

-15-

62.     In a report of the incident, discussed below, Sgt. Kirkland indicates that at least one or more Corrections Officers, presumably including Kirkland himself, were in the Control Room when Officer Broyles escorted Plaintiff to 3 Cell and placed him inside.

63.     Yet, knowing the circumstances and risks, Sgt. Kirkland and other Corrections Officers were purportedly not monitoring 3 Cell video at that time.[13] According to Kirkland, he immediately heard one of the inmates on the "box" (the intercom allowing communications between 3 Cell and the Control Room) summon officers to come and remove Plaintiff from 3 Cell, and Kirkland himself went to 3 Cell to investigate.

**F.      Sgt. Kirkland's Warning Implies Inmate Webster Was Involved in Previous Assaults.**

64.     Sgt. Kirkland asked Webster, "do you know him?"  Webster responded, "no." Sgt. Kirkland replied, "He's drunk, he's drunk. ***What did I always tell you? If shit goes down get me back here before you do shit like this***."

65.     As the Hall Video ends at 5:31, a trail of blood can be seen on the hallway floor from the 3 Cell door to the control room, tracking Plaintiff's steps. [Hall Video, 5:31].

---

[13]Sgt. Kirkland, as discussed below, was terminated about a month later after smuggling contraband into the Jail for an inmate. He was charged with official misconduct and other offenses related to conspiring with inmates to smuggle contraband into the Jail. Plaintiff believes that discovery is necessary to determine whether the beating of Plaintiff by Webster and Moss was actually orchestrated by Sgt. Kirkland, given his knowledge of Webster as a violent inmate and Kirkland's decision to assign the non-violent, intoxicated, and disabled Plaintiff to 3 Cell anyway.

-16-

**G.      Sgt. Kirkland's Report**

66.      According to Sgt. Kirkland, just as Officer Broyles had returned to the control room after escorting Plaintiff to 3 Cell, "3 Cell paged to control via page box approximately 11:38 p.m." Sgt. Kirkland reported that he "answered the box to see what was needed," and Inmate Webster responded, "Come get this mother fucker out of here."

67.      Sgt. Kirkland then reported that he "rushed back to 3 Cell to see what the issue was" and at approximately 11:59 p.m., found Plaintiff "bleeding from his face" and "noticed severe swelling in his face and right eye." Meanwhile, Inmates Moss and Webster "were standing next to the shower area with blood on them."

68.      Sgt. Kirkland reported that he then contacted the jail nurse, who informed him to send Plaintiff "to Newport Medical to be examined and get medical attention." Plaintiff was put in the back of the ambulance and transported to Newport Medical, accompanied by Officer Broyles.

69.      Sgt. Kirkland reported that he had reviewed cameras to investigate the incident and found that once Plaintiff had been placed in 3 Cell, he had gone to use the toilet. Inmates Moss and Webster got out of bed to see who had entered the cell and lingered around the shower/toilet area. Kirkland reported that after Plaintiff stood up and pulled his pants up, Moss and Webster made a statement to him and Plaintiff's response "appeared to anger" Moss and Webster, who approached Plaintiff and repeatedly punched him in the face. "After inmates Moss and Webster stopped, Webster hit the page box to inform control."[14]

---

[14]Shift notes provided to Plaintiff's attorney make no reference of the incident.

-17-

**H. Plaintiff Air-lifted to UTMC for High Level Trauma Care**

70.      Plaintiff was initially taken by ambulance to Newport Medical Center, and was then airlifted to the University of Tennessee Medical Center ("UTMC") in Knoxville because he required a high level of care (trauma). Plaintiff's injuries included maxillofacial trauma, neck pain, chest trauma, head trauma, significant swelling over the right side of the face, contusion of an eyeball and orbital tissue, edema of his right upper eyelid, ocular pain in his right eye, significant right-sided periorbital ecchymosis with multiple lacerations of the right cheek and lip, a proptotic right globe, and a retrobulbar hematoma. Plaintiff's medical bills were approximately $96,000.

71.      Inmates Webster and Moss are both convicted felons. Webster, 6'0" and 180 pounds, had been booked on May 9, 2023. Moss, 5'7" and 135 pounds, had been booked a week later, on May 15, 2023. Webster and Moss were known by Corrections Officers to be violent inmates with a history of violent charges, including aggravated assault and aggravated domestic assault.

**I. Failures to Classify and Segregate Violent From Non-Violent Inmates.**

72.      On information and belief, the Jail has no classification system that differentiates between post-trial and pre-trial detainees, between violent and non-violent offenders, between inmates charged with and/or convicted of felonies and those charged with and/or convicted of misdemeanors. The Jail rarely, if ever, separates intoxicated or disabled pretrial detainees from the general Jail population, including violent inmates. The Jail does, however, separate male and female inmates.

73.      Based upon more than a decade of Tennessee Corrections Institute ("TCI") Inspection and Re-Inspection Reports, Corrections Officers at the Jail routinely fail to classify and segregate inmates in any way. In June 2023, the TCI reported "Classification is difficult to achieve due to

-18-

overcrowding." Predictably, Plaintiff, a non-violent offender who the Defendant Corrections Officers each recognized as being intoxicated and disabled, was never properly assessed by the booking officer, Officer Bococke.

74. Officer Bococke, having checked the box marked "classify" on the booking sheet, did not assign Plaintiff to a holding cell, medical unit, or even a cell populated with non-violent officers. Rather, she assigned Plaintiff to 3 Cell, inhabited by two known violent criminal troublemakers who brutally assaulted him within two minutes of his arrival.

75. The booking sheet indicated that Officer Bococke recognized that the intoxicated Plaintiff was neither violent nor a felon. She knew the charges for which he was arrested. She purportedly checked his criminal history.

76. Yet, Officer Bococke failed to do her job, putting Plaintiff in a cell where known violent felons essentially laid in wait for him. Her supervisor, Sgt. Kirkland, then endorsed that failure.[15] Sgt. Kirkland's post-assault comment to Inmate Webster that he had warned him earlier ("[w]hat did I always tell you? If shit goes down get me back here before you do shit like this") also indicates that Sgt. Kirkland was keenly aware that Webster had been a trouble-maker at the Jail.

77. According to Sgt. Kirkland's report, he did not direct Officer Broyles to escort Plaintiff to a different cell "due to 3 Holding being fully populated, 2 Holding being occupied with

---

[15]Corrections officers routinely ignore inmate criminal histories before making cell assignments, as they are required to do. https://www.nashvillescene.com/news/features/article/21106770/tennessees-county-jails-are-plagued-with-overcrowding-and-underfunding

-19-

a medical, and 1 Holding being female intakes." In other words, no holding cell was available for the intoxicated Plaintiff. The Jail was over-capacity, so they placed an inebriated, non-violent, and disabled inmate in 3 Cell, knowing that two violent felons, Webster and Moss, lay in wait for him.[16]

78.     Based upon recent TCI Inspection and Re-Inspection Reports, both Sheriff Ball and Chief Hartsell knew that Corrections Officers at the Jail routinely failed to follow minimum jail standards and policies, deliberately and recklessly failing to classify inmates to avoid substantial risks of serious harm to them, and altogether ignoring the prevalence of inmate-on-inmate assaults. Yet, they failed to correct this, knowing all along that such failures would likely result – and did result – in serious harm to pretrial detainees and other inmates.

79.     For years, the Jail has been referred to by inmates, corrections officers, and even attorneys as "the Wild Wild West," largely because of the free reign given to known violent inmates. That two such inmates – Webster and Moss – known by Corrections Officers to be violent trouble-makers in the Jail – were deliberately and recklessly given license to severely beat the Plaintiff, an intoxicated and disabled inmate, within two minutes of him being booked, suggests the moniker, "Wild Wild West," was well-earned.

---

[16]There were reasonable alternatives to placing Plaintiff in 3 Cell with violent inmates, which would have avoided the substantial risk of injury to Plaintiff.

J.    **The Moving Force Behind Plaintiff's Beating: Unsafe Jail Conditions, Antiquated Facilities, Overcrowding, Under-staffing, an Inadequate Classification System, and Unqualified Officers.**

*"There's no sense that anybody should have to live like this."*[17]

80.    Former Sheriff Fontes told WVLT-TV that "one of the reasons why our jail was de-certified" was "because of the fact of overcrowdedness . . . .'"[18] Fontes informed County Commissioners that the Jail is "grossly overcrowded and under staffed," and that "this is a serious risk of safety, and a serious liability for the county."[19] These conditions, Fontes told one reporter, also prevent him from properly segregating inmates.[20]

81.    By the time Plaintiff entered the Jail on July 2, 2023, the Jail had been continuously overcrowded for more than a decade, exceeding its 120-person capacity by between *200% and 310%*. In January 2020, for example, the Jail was *262.5% beyond capacity*, with 215 inmates.[21]

82.    County officials know – through years of failed TCI Inspections and Re-inspections, multiple lawsuits alleging civil rights violations, and hundreds of inmate-on-inmate beatings[22] – that

---

[17]A Cocke County Jail inmate, speaking to a WBIR-TV news reporter.

[18]*Id.*

[19]*See* "*Sheriff: Cocke Co. Jail Is 'Inhumane,' Poses a 'Serious Risk to Safety'*" https://www.13wmaz.com/article/news/local/sheriff-cocke-co-jail-is-inhumane-poses-a-serious-risk-to-safety/51-e59b4b4a-fc84-4314-9580-a0315c3a172f

[20]*Id.*

[21]In fact, summary report-data provided by the Tennessee Corrections Institute ("TCI"), dating back to 2000, indicates that since 2011, only one County in the state (Van Buren) has consistently had a larger overcapacity percentage of inmates in its jail than Cocke County Jail. *See* historical TCI Jail Summary Reports https://www.tn.gov/correction/statistics-and-information/jail-summary-reports.html.

[22]In 2018, more than 50 assaults were recorded between inmates and Jail officers. *See* "*Overcrowding Breeds Ugly Fights Inside Cocke County Jail*," WVLT TV, Jan. 31, 2020,

-21-

conditions at the Jail are inhumane and overcrowded. Inmate-on-inmate assaults are almost a daily occurrence. Still, neither the County nor the Sheriff has taken meaningful steps to abate those unsafe conditions. The County has failed to provide adequate resources or fund a new Jail.[23]

83.    The TCI found that overcrowding at the Jail has led to an increase in inmate-on-inmate assaults and "strongly recommended" that the County fund additional Jail staff and take steps to update the Jail's "deteriorating" buildings.[24]

84.    As serious as they were, the TCI's recommendation had little or no effect on improving conditions at the Jail. "Although this is definitely an issue that we take seriously, and it's an issue, it's one in a series of issues," Clay Blazer, then chairman of the County Commission, told WVLT-TV. According to Blazer, there are not enough funds for a new jail.[25]

85.    In fact, the Cocke County Commission has been so disinterested with conditions at the Jail that when the issue was on the Commission's meeting agenda for discussion, so few Commissioners attended the meeting that the body lacked a quorum to conduct official business.

---

available at https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail567474631.html (last accessed April 30, 2024). More than 50 inmate-on-inmate assaults occurred again in 2019 and 2020. No records are available to Plaintiff for 2021-24, but there is no indication that the number of assaults have dissipated.

[23]See "*Overcrowding Breeds Ugly Fights Inside Cocke County Jail*,' WVLT TV, Jan. 31, 2020, available at https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail567474631.html (last accessed April 30, 2024) (Sheriff Fontes: "This is not a new issue – it's been here along time.").

[24]https://www.nashvillescene.com/news/features/article/21106770/tennessees-county-jails-are-plagued-by-overcrowding-and-underfunding

[25]https://www.wvlt.tv/content/news/Cocke-County-leaders-address-courthouse-security-and-jail-issues-450489593.html

86.     The unsafe Jail conditions also put inmates, especially pretrial detainees and vulnerable inmates, at risk. Former Sheriff Fontes conceded that Jail overcrowding is a breeding ground for fights between inmates.[26] Inmates are locked away in dorm-style cells, sometimes shared by more than 25 different people. "When you're in a large group – it's like a street gang. They all feed off each other," Fontes said.[27] "Put yourself in their shoes. Imagine being locked in a cell 24 hours a day, 7 days a week, with 24 other people."[28]

87.     Former Sheriff Fontes also conceded that fights are commonplace in the Jail, with few holding cells to separate inmates. He further acknowledged that liability comes with these conditions, stating that "a jail is a community's largest liability when it comes to lawsuits," confessing that "This is not a new issue – it's been here a long time."[29]

88.     Along with run-down facilities, overcrowding, under-staffing, and increasing inmate-on-inmate assaults, the Jail is also staffed by inexperienced Corrections Officers. Former Sheriff Fontes explained: "You don't get good quality people – you get a young person looking for a job who lacks the life experiences to help them handle situations. They need to be the ones who are

---

[26] *"Overcrowding Breeds Ugly Fights Inside Cocke County Jail"* (Jan. 31, 2020) https://www.wvlt.tv/content/news/Overcrowding-breeds-ugly-fights-inside-Cocke-County-jail-567474631.html

[27] *Id.*

[28] *Id.*

[29] *Id.*

-23-

patient and calm and not react to a mouthy inmate or someone who's being belligerent." It is commonplace for five or fewer officers to manage the two Jails, "resulting in decreased safety and security."[30]

89.     Such systemic deficiencies in facilities, conditions, procedures, or staffing have led to a pattern – even a policy – of deliberate indifference to the safety of inmates, particularly pretrial detainees.

### K.     Failed State Inspections and Decertification

90.     For a number of years, the Jail has failed to satisfy even the minimum standards to achieve re-certification by the TCI. Inspectors for the TCI have reported "alarming deficiencies regarding the structure of the building, security, and medical services," all of which they relate to jail overcrowding and under-staffing.

91.     In repeatedly refusing to certify the Jail on inspection after inspection over the past seven years, TCI inspectors have found, among other deficiencies:

- the Jail and Jail Annex are overcrowded and understaffed;

- "Classification is difficult to achieve due to overcrowding";

- under-staffing makes "it virtually impossible to meet the needs of the facility and perform the required task to ensure safety and security";

- "limited staff is affecting the ability to perform required functions relating to security, custody, and supervision of inmates";

- insufficient staffing is resulting in security checks being conducted visually by camera;

--------------------------------

[30]https://www.nashvillescene.com/news/features/article/21106770/tennessees-county-jails-are-plagued-by-overcrowding-and-underfunding

-24-

- security checks on inmates are not being timely properly conducted;

- poor "staff performance quality";

- Jail staff cannot properly supervise inmates; and

- Jail staff is inadequately trained.

92.     More recent inspections of the Jail and Jail Annex by TCI inspectors (including 2022 and 2023 annual inspections and re-inspections) reveal the primary reasons for the Jail's de-certification as (a) "due to the deficiencies listed in the report that are related to the continued overcrowded conditions . . . . Most of the inmate housing units have an occupancy level well above their certified capacity, resulting in inmates being place on the floors with minimal walking space"; and (b) "due to the overcrowded conditions, the number for inmate asaults are rising with a contributing factor being the facility's inability to properly classify inmates, placing both inmates and officers at increased risk for harm." Other deficiencies include:

- "The physical plant does not accommodate the facility classification plan as outlined in their polcy and procedure";

- "inmates not being classified and missing criminal history checks";

- "The facility is not completing the classification process for all inmates being housed";

- "The physical plant and inmate overcrowding do not allow for the facility classification plan to be followed as outlined in their policy and procedure."

- "Holding area are currently being used to house inmates with newly admitted inmates";

- "limited staff is affecting the ability to perform required functions relating to security, custody, and supervision of inmates";

-25-

- "security checks" on inmates "are negatively affected due to minimal staffing availability and inability to respond to needed duties";

- "security checks are out of compliance as well as special observation watches";

- "The facility is not conducting or logging security checks within an hourly basis on an irregular schedule";

- "[m]any of the deficiencies" in the Jail and Jail Annex "are a result of inmate overcrowding and minimal staff available to perform the task required";

- the Jail and Jail Annex have consistently failed to provide "appropriate housing of inmates for classification purposes";

- "Criminal Histories on inmates for classification purposes are not being completed on inmates prior to placement in general population";

- "[w]ith the continued rise in the inmate population, proper classification of inmates is unattainable"; and

- "there is insufficient housing to accommodate overcrowding conditions."

93.    The County, former Sheriff Fontes, Sheriff Ball, and Chief Hartsell all knew the TCI had decertified the Jail in 2017 "after two years of failed inspections and warnings about lax employee training, staffing shortages, inadequate medical care and safety violations[.]"[31]

---

[31]"*Cocke County Loses Jail Certification*," Knox News, Oct. 4, 2017, available at https://www.knoxnews.com/story/news/crime/2017/10/04/cocke-county-loses-jail-certificationgarners-lawsuit-over-32-year-old-inmates-death/725437001/ (last accessed March 19, 2023).

-26-

94.     On September 7, 2017, Mayor Crystal Ottinger and former Sheriff Fontes appeared before the Cocke County Corrections Partnership workshop to discuss their recent appearance before the TCI. Mayor Ottinger bluntly stated that the TCI's review committee indicated that the Jail was not re-certified because that committee "believes *it is unsafe for inmates and staff*."

95.     The 2018 TCI report condemned the Jail's "deficiencies . . . related to the continued overcrowded conditions as well as the outdated, deteriorating, and antiquated facility," noting "[t]his serious situation is only heightened by the need for additional staff on each shift to provide the necessary supervision throughout the facility." It also criticized excessive turnover: "[t]he current budget allows for 25 full-time officers, which fails to meet the minimum number of staff required."

**L.     Correction Officer Corruption, Civil Rights Cases, Inmate-on-Inmate Assaults**

96.     The Cocke County Jail is not, according to former Sheriff Fontes and media reports over the past few years, a bastion of law enforcement morality. On August 30, 2016, two terminated employees of the CCSO – Autumn Davis, a nurse, and Shayelen Scheffers, a corrections officer, were indicted for obtaining controlled substances by fraud and conspiracy to possess a controlled substance. Davis used her position as a nurse to get Oxycodone and Hydrocodone pills. Scheffers helped.

97.     On March 30, 2017, Charles Webb, a former Jail employee accused of bringing drugs into the Jail Annex, was indicted for four counts of introduction of drugs into a penal institution. Webb was fired and CCSO started an investigation.

98.     Corrections Officer Alyssa Lane and Cpl. Jason Phillips were also terminated on June 29, 2017 for "committing serious policy violations and potential civil rights violations." In a media release, former Sheriff Fontes stated, "[i]n this case, I can't give any details, with these two

-27-

employees, they were in clear violation of departmental policy . . . . And they also in my opinion, I think that they are potentially in violation of civil rights, based on their actions." Fontes said that he had personally contacted the FBI to investigate this case due to the potential civil rights violations.

99.     Two weeks later, on July 13, 2017, two more Jail employees were terminated for smuggling methamphetamine into the Jail for inmates. On August 17, 2017, the CCSO arrested Kyle VanDaley and Heather Boyd, and charged them with official misconduct and introducing contraband into a penal facility.

100.     In September 2017, inmate Amanda Hill, a diabetic and recent domestic-assault victim, whose former boyfriend had recently doused her with rubbing alcohol and set her afire, causing second- and third-degree thermal burns from her shoulders to her legs, was arrested on a probation violation and booked into the Jail. Hill's condition required intensive medical care. Suffering unbearable pain due to the thermal burns, Hill begged for medical attention. Two days later, Hill was found unresponsive in her cell. She died, having received no meaningful medical care at the Jail. Hill's mother filed suit against the County, Sheriff Fontes, Corrections Officers (including Lane and Phillips), and others for civil rights violations and wrongful death. The case was eventually settled. *See Burgin v. Cocke County et al.*, No. 2:17-cv-00173-JRG-MCLC, DE 44 (E.D. Tenn. May 21, 2019).

101.     In August, 2023, Sgt. David Fletcher Kirkland, Jr., a Defendant **and supervisor** in this case, was arrested by CCSO Officers and accused of smuggling drugs and a cell phone to an inmate in the Jail. According to Sheriff Ball, he was charged with bringing contraband into a penal facility, conspiracy to bring contraband in, and official misconduct. Kirkland's potential

-28-

involvement in the assault on the Plaintiff, given his knowledge of Plaintiff, Webster, and Moss, requires discovery.

102.     Inmate-on-inmate assaults at the Jail and Jail Annex appear to be commonplace. Some assaults are reported by media, especially when charges are brought against the offenders. For example, in July 2017, three inmates assaulted Kevin Hill – violently punching and kicking him in the head as he lay on the floor of his cell. On July 15, 2018, two separate violent assaults occurred at the Jail – one in which five inmates jumped another, who was transported to the hospital with serious injuries, and another in which two inmates assaulted inmate Luke Gibson. On January 10, 2020, another inmate, Dexter Manning, was beaten by multiple known violent inmates, suffering severe facial trauma and multiple facial fractures, while the only corrections officers working were Sheriff Ball and Chief Hartsell, individually 400 feet away across the street and railroad track. On March 19, 2022, 34-year old Steven J. Laws was jailed on misdemeanor drug charges. Laws was savagely and repeatedly beaten by several known violent inmates over the course of an hour, losing consciousness from head blows. He was beaten and stomped in his cell, dragged into the showers and beaten again, and dragged back to his cell and beaten yet again. No Corrections Officer even noticed the battered and bleeding Laws *for twelve hours*. Laws sustained serious head and facial trauma, including a concussion, multiple jaw fractures that required emergency surgery, lacerations, bruises, swelling, and injuries to his neck, back, and hip.

### M.     Real World Consequences

103.     The deplorable Jail conditions have real world consequences. In this case, a number of the deficiencies found by the TCI inspectors directly and/or indirectly impacted Plaintiff's safety as an inmate, including the overcrowding, understaffing, poor staff performance, poor quality staff,

-29-

inadequate training, no classification system, and failure to classify and segregate violent and non-violent offenders and protect intoxicated pretrial detainees.[32]

### N. Circumstances Require Discovery to Permit Plaintiff to More Precisely Allege His Claims.

104.     Plaintiff was compelled to file this Complaint without the benefit of information available only to the Defendants, including the most recent TCI Inspection and Re-inspection Reports. Shift reports obtained by Plaintiff do not even reference the incident. Plaintiff does not have copies of TCI Inspection or Re-Inspection Reports for the period covering July 2023. Plaintiff was beaten so viciously that he does not recall specific details about the assault. More precise allegations might have been made if the County had fully responded to Plaintiff's public records request. Accordingly, some of the allegations herein have been made upon information and belief, and not on Plaintiff's personal knowledge.

## V.  CLASS ALLEGATIONS

### (Against Cocke County)

105.     Plaintiff brings his claims individually and on behalf of a proposed class of male inmates and former male inmates who were incarcerated at the Jail at any period from July 2023 until the date of trial, under Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

---

[32]There have been other serious real world consequences as well.  For example, in August 2016, after an inmate overdosed on drugs smuggled into the Jail, Sheriff Fontes stated:

> "This is a prime example of the amount of catastrophic liability our jail faces daily. I have reported time and time again to the County Commission that we need adequate manpower and a better physical facility."

106.     ***Class Definition.***  Plaintiff proposes the following Class, subject to modification by the Court as required:

> All adult men who, for any period of time between July 2, 2023, and the trial of this action, have been incarcerated in the Cocke County Jail as pretrial detainees, and whose charges and criminal history should have required them to have been segregated from charged or convicted violent inmates, and who were victims of assaults by other inmates.
>
> All such pretrial detainees were at substantial risk of serious harm due to the dangerous conditions of confinement (including overcrowding, under-staffing, inadequate training, and lack of a meaningful inmate classification policy) and the policies, practices, and/or customs of deliberate indifference of the County to the safety and security of such pretrial detainees.

107.     ***Numerosity: Fed. R. Civ. P. 23(a)(1).*** The proposed class as defined is sufficiently numerous that joinder of all members of the class is impracticable. Currently, upon information and belief, there are approximately 150-200 inmates in the Jail on any given day. Hundreds of individuals have been incarcerated at the Jail since July 2023 and inmate-on-inmate assaults are almost a daily occurrence.

108.     Class members are identifiable using records maintained in the ordinary course of business by Defendants.

109.     ***Commonality: Fed. R. Civ. P. 23(a)(2).*** There are questions of law and fact common to the Class, including, but not limited to whether the County's failure to train corrections officers, continuing unsafe jail conditions, and failure to protect pretrial detainees from inmate-violence constitute deliberate indifference and violate the Fourteenth Amendment.

-31-

110.     *Typicality: Fed. R. Civ. P. 23(a)(3).* The claims of the named Plaintiff against the County are typical of the claims of members of the proposed Class. Plaintiff and the Class have sustained injuries arising out of and caused by the common course of conduct, as alleged herein.

111.     *Adequacy: Fed. R. Civ. P. 23(a)(4).* Plaintiff is a member of the Class and will fairly and adequately represent and protect the interests of putative Class members because he has no conflict antagonistic to those of the other Class members. Plaintiff has also retained counsel who are competent and experienced in complex class action litigation and civil rights litigation.

112.     *Fed. R. Civ. P. 23(b)(1)(A) and (B).* Since the number of Class members is likely at least in the hundreds, separate actions by individuals could result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the County.

113.     *Fed. R. Civ. P. 23(b)(3).* There are common questions of law and fact that predominate over any questions affecting only the individual members of the Class.  The wrongs alleged against the County are common to each and every member of the putative Class. A class action is a superior method for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce the County to comply with federal law. The interest of Class members in individually controlling the prosecution of separate claims against the County is small. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

## VI.   WAIVER OF IMMUNITY

114.     The County has waived immunity for their negligence and the negligence of their employees, misconduct of deputies acting under color of law, and for the negligence of deputies or

employees of the County, as set out in Tenn. Code Ann. §29-20-305, and for intentional acts or misconduct done by deputies under color of law, as set out in Tenn. Code Ann. §8-8-302-302.

115.     There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

## VII.  CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF 42 U.S.C. § 1983
### FAILURE TO PROTECT UNDER THE FOURTEENTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION

#### (Against Sheriff Ball and Chief Hartsell)

116.     Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-113, as if fully set forth herein.

117.     Under 42 U.S.C. § 1983, a person has a federal cause of action for money damages against an individual acting under color of state law who deprives another of rights, privileges, or immunities secured by the United States Constitution and federal laws. Here, Sheriff Ball and Chief Hartsell were acting under color of state law.

118.     From the moment of Plaintiff's incarceration, the County, Sheriff Ball and Chief Hartsell owed him a duty of care to protect him from harm. A special relationship existed between Plaintiff and those Defendants, which gave rise to that duty and they breached their duty by failing to protect him under the circumstances.

119.     At the time of the assault, the law was clearly established that Defendants' deliberate indifference and reckless disregard to the safety of pretrial detainees from harm is a constitutional violation.

-33-

120.    When Plaintiff, a DUI offender, was booked, he was incarcerated under conditions that posed a substantial risk of harm to his safety, *e.g.*, intoxicated and disabled, due to overcrowding and the lack of an inmate classification system, he was assigned to a cell with violent inmates.

121.    Sheriff Ball and Chief Hartsell, who control the policies, staffing, and conditions at the Jail, knew or should have known that housing intoxicated, disabled, and/or non-violent offenders in a cell with known violent offenders created a serious risk of harm, yet neither took any action to abate or mitigate that risk for such pretrial detainees. Here, at least one of the violent inmates who assaulted Plaintiff – Inmate Webster – was known by Corrections Officers, and presumably Sheriff Ball and Chief Hartsell,  to have engaged in similar conduct at the Jail since May 2023.

122.    Sheriff Ball and Chief Hartsell, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Plaintiff's safety, and to the safety of other pretrial detainees, by, among other things:

> ■ failing to take action to ameliorate the chronic and persistent overcrowding, understaffing, and inmate-on-inmate assaults;

> ■ failing to hire, train, and supervise qualified Corrections Officers to monitor and/or supervise inmates;

> ■ failing to implement meaningful or effective policies or procedures to properly classify inmates and segregate non-violent pretrial detainees from violent inmates or intoxicated pretrial detainees from the general Jail population;

> ■ failing to implement policies or procedures to insure that Corrections Officers perform regular and routine security checks on inmates; and

> ■ failing to use in-cell video cameras to monitor inmates, especially at-risk inmates housed with known violent inmates.

-34-

123.     As demonstrated by repeated public statements and official reports, County officials, including former Mayor Ottinger, the Board of Commissioners, former Sheriff Fontes, and Chief Hartsell, knew – for many years – that the Jails were overcrowded, understaffed, and unable to provide safe and secure facilities for inmates due to lack of resources. Despite such knowledge, those County officials failed to address these serious problems. In doing so, the County, the Sheriff, and Chief of Corrections acted with deliberate indifference to the substantial risk of serious harm to pretrial detainees, including the Plaintiff.

124.     Sheriff Ball and Chief Hartsell are supervisory officials for the CCSO and are responsible for the implementation of policies and procedures regarding the booking, classification, and segregation of pretrial detainees, and all measures to insure inmate safety and security.

125.     Sheriff Ball and Chief Hartsell also knew that the Corrections Officers were ill-experienced, ill-trained, and otherwise ill-equipped to deal with the tense Jail environment created by the unsafe conditions of confinement.

126.     At all times material hereto, the CCSO, Sheriff Ball, and Chief Hartsell knew that Corrections Officers, including Sgt. Kirkland and Officers Bococke and Broyles, were deliberately and recklessly housing non-violent pretrial detainees or pretrial detainees otherwise at risk of assault with violent inmates, creating the likelihood for inmate-on-inmate violence.

127.     At all times material hereto, Sheriff Ball and Chief Hartsell had the authority and ability to segregate inmates according to their propensity for violence and to instruct Corrections Officers to segregate inmates accordingly. *See* Tenn. Code Ann. § 41-4-103.

128.     On information and belief, Sheriff Ball and Chief Hartsell knew that Corrections Officers were disregarding the violent criminal histories of inmates and deliberately and recklessly

-35-

placing convicted violent felony offenders with non-violent pretrial detainees, notwithstanding the risk of harm to those non-violent offenders. Yet, they failed to correct this and failed to implement a proper classification system, knowing their failure would likely result – and has resulted – in physical harm to non-violent or otherwise at-risk pretrial detainees by habitually violent offenders.

129. As supervisory officials, Sheriff Ball and Chief Hartsell were well aware that the failure to have an adequate classification and/or segregation system would result in increased instances of inmate-on-inmate assault, like the assault on Plaintiff, and the other assaults. Nevertheless, they implemented or ratified policies, practices, and/or customs that deprived Plaintiff of his right to be free from physical assault while confined in the Jail, including:

> ■ accepting prisoners despite well beyond the maximum capacity;
>
> ■ failing to take reasonable measures to reduce the inmate population;
>
> ■ failing to implement a proper classification system to segregate non-violent pretrial detainees from known violent inmates or to segregate intoxicated or other at-risk pretrial detainees from known violent inmates; and
>
> ■ failing to staff the Jail with competent and qualified officers to insure that inmates are properly classified at booking, housed accordingly, and supervised at all times.

130. The substantial risk of inmate attacks at the Jail is longstanding, pervasive, and well-documented. Because Sheriff Ball, who was originally hired to be a Corrections Officer at the Jail, and Chief Hartsell have continuously been exposed to reliable information concerning the risks, *e.g.*, via incident reports of assaults, Jail videos, TCI inspections and reports, frequent media investigations and news reports, and lawsuits, they certainly knew about it.

-36-

131.     Sheriff Ball and Chief Hartsell acted with "deliberate indifference" to the safety of Plaintiff. They deliberately and recklessly disregarded the substantial risk to Plaintiff's health or safety. Nevertheless, neither official took action to respond reasonably to the risks.

132.     These officials also knew that by (1) routinely failing to properly classify inmates based upon the seriousness of their offenses and propensity for violence, as Sgt. Kirkland and Officers Bococke and Broyles had done in Plaintiff's case, and (2) routinely failing to monitor or supervise the dozens of inmates, especially at-risk pretrial detainees housed with known violent inmates, via real-time control room video monitors of in-cell video cameras, they were being deliberately indifferent to or tacitly authorizing those practices. If Plaintiff had been properly segregated, and/or if Corrections Officers had been monitoring 3 Cell after locking him up with violent inmates, it is likely that Plaintiff would not have suffered serious injuries.

133.     As a direct and proximate result of the acts or omissions of these Defendants, Plaintiff suffered serious injuries, including eye and head trauma, facial lacerations, bruises, swelling, and other injuries, as well as psychological trauma associated with the brutal attack.

134.     Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

**COUNT TWO**

**VIOLATION OF 42 U.S.C. § 1983**
**FAILURE TO PROTECT UNDER THE FOURTEENTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION**

**(Against Sgt. Kirkland and Officers Bococke and Broyles, Individually)**

135.     Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-113, as if fully set forth herein.

-37-

136.     Sgt. Kirkland and Officers Bococke and Broyles were all acting under color of state law.

137.     As a result of the special relationship that existed between Plaintiff and these Officers, they owed Plaintiff a duty of care to protect him from harm. They breached that duty by failing to protect him.

138.     Sgt. Kirkland and Officers Bococke and Broyles acted deliberately and recklessly in the face of an unjustifiably high risk of harm that was either known to them or so obvious that it should have been known to them. They also took no reasonable steps to abate that risk.

139.     At the time of this incident, the law was clearly established that deliberate indifference to the safety of pretrial detainees from harm is unconstitutional.

140.     The substantial risk of inmate attacks at the Jail is longstanding, pervasive, well-documented, and has been expressly acknowledged by County officials. The circumstances suggest that Sgt. Kirkland and Officers Bococke and Broyles – each having acknowledged (by signature) receipt of CCSO policies and TCI's minimum standards, and having been exposed to reliable information concerning the risks – must have known about the risks to vulnerable pretrial detainees like the Plaintiff. They cannot hide behind the excuse that they were unaware of such risks.

141.     Sgt. Kirkland and Officers Bococke and Broyles all had knowledge of the violent criminal histories of Inmates Webster and Moss, as well as Plaintiff's lack of such criminal history. They also knew Plaintiff was intoxicated and disabled. Yet, Sgt. Kirkland and Officer Bococke inexplicably assigned Plaintiff to the same cell as Webster and Moss – violent felons (3 Cell) and then all three officers completely failed to monitor 3 Cell.

-38-

142.     By failing to segregate Plaintiff from violent inmates, these Defendants acted with deliberate indifference to Plaintiff's constitutional rights.

143.     Plaintiff faced a substantial risk of serious harm, and Sgt. Kirkland and Officers Bococke and Broyles acted with deliberate indifference to that risk, causing Plaintiff's serious injuries.

144.     Regardless of what prompted the assault, it likely would not have happened if Sgt. Kirkland and Officers Bococke and Broyles had not placed Plaintiff in the same cell as Inmates Webster and Moss.

145.     Having placed Plaintiff in substantial danger, Sgt. Kirkland and Officers Bococke and Broyles all failed to take reasonable measures to protect him from assault.

146.     For instance, Sgt. Kirkland and Officers Bococke and Broyles failed to monitor 3 Cell's video camera in the control room. If they had done so, they would have had an opportunity to prevent or at least interrupt the beating of Plaintiff.

147.     Each of the officers had an opportunity to monitor 3 Cell and watch the incident unfold by watching the control room monitors that showed what was happening in 3 Cell. Sgt. Kirkland apparently sat in the Control Room, where the video monitors of 3 Cell gave him a perfect vantage point from which to monitor Plaintiff in 3 Cell, and did nothing. Officer Broyles is seen in the Hall Video walking down the hallway adjacent to 3 Cell, hearing loud noises and a commotion coming from 3 Cell, going back and looking into 3 Cell, but then returning to the control room. Officer Bococke also walked down the hall, hesitated at 3 Cell at least twice after hearing a yelling and a loud commotion inside, and ignored it.

-39-

148.     As a direct and proximate result of the acts or omissions of Sgt. Kirkland and Officers Bococke and Broyles, Plaintiff suffered serious injuries, including eye and head trauma, facial lacerations, bruises, swelling, and other injuries, as well as the emotional trauma associated with the brutal attack.

149.     Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

### COUNT THREE

**VIOLATION OF 42 U.S.C. § 1983**
**DELIBERATE INDIFFERENCE TO SAFETY OF PRETRIAL DETAINEES UNDER**
**THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(MUNICIPAL LIABILITY)**

**(Against Cocke County)**

150.     Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-113, as if fully set forth herein.

151.     From the moment of Plaintiff's incarceration, the County had a duty of care to protect Plaintiff from harm.

152.     The County acted in deliberate indifference to Plaintiff's safety by utilizing improper policies, customs and/or procedures – or no procedure at all – where there was an obvious risk to inmate health and safety.

153.     The County subjected Plaintiff to conditions of confinement so unsafe that they created a substantial risk that he would be harmed. As a result, Plaintiff was savagely beaten by known violent inmates and suffered serious injuries.

-40-

154.     At the time Plaintiff was savagely beaten by inmates in the Jail, the law was clearly established that deliberate indifference to the safety of pretrial detainees from harm is a constitutional violation.

155.     A governmental entity may be held liable based upon its officers' deliberate indifference to and violation of a citizen's constitutional rights where a custom, policy, or procedure of the municipality is found to be the proximate cause of the constitutional violation.

156.     Dating back to 2011, only one Tennessee county (Van Buren) has consistently had a larger over-capacity percentage of inmates in its jail than Cocke County. For no fewer than eleven consecutive years, the Jail has exceeded its 120-person maximum capacity for housing inmates. At times, the Jail has been over *300% beyond capacity*.

157.     The County's former Sheriff, former Mayor, Board of Commissioners, current Sheriff (who formerly worked at the Jail as a Corrections Officer), and Chief of Corrections have long-known that Jail conditions in Cocke County are inhumane. They also have long-known that these and other conditions have increasingly given way to a growing number of inmate-on-inmate assaults, becoming an almost daily occurrence. Yet, the County has done little or nothing to alleviate the unsafe conditions.

158.     The Jail has not been certified by the Tennessee Corrections Institute ("TCI") since 2017. Repeated failed inspections, failed re-inspections, and decertification of the Jail by the TCI have made little or no difference, as the County, County Mayor, County Commission, and Sheriff appear uninterested in protecting inmates from often brutal assaults. According to the former Sheriff, the conditions have made the Jail "a breeding ground for fights between inmates," comparing some

-41-

cells to "street gangs." Equally deplorable is the County's small staff of inexperienced and unqualified Corrections Officers, which leads to "decreased safety and security."

159.     The County failed to protect the Plaintiff, a particularly vulnerable inmate, by failing to have any meaningful classification system, much less an adequate classification system. Here, the absence or inadequacy of a meaningful classification system resulted in the failure of Corrections Officers to protect the Plaintiff's constitutional rights.

160.     The County, however, had been on notice since at least July 2012 of the deficient or non-existent inmate classification system and the substantial and obvious risks faced by vulnerable pretrial detainees, yet they failed to correct those deficiencies.

161.     These continuing and systemic deficiencies in Jail conditions amount to a pattern of deliberate indifference to inmate safety. The former Mayor not disputing that the Jail *"is unsafe for inmates and staff."*

162.     The results of these glaring deficiencies are startling, ranging from policy violations by now-terminated Corrections Officers, to officer-corruption and criminal indictments, to increasing inmate-violence, and to constitutional violations causing inmate-injuries and even deaths.

163.     The failure to remedy overcrowding, under-staffing, the absence of even a rudimentary classification system, and other unsafe conditions is so pervasive as to constitute an actual policy, practice, or custom on the part of the County not to protect non-violent pretrial detainees, intoxicated pretrial detainees, or even disabled pretrial detainees from known violent inmates. County officials have, after all, admitted that overcrowding and under-staffing are the root-cause of inmate-on-inmate violence at the Jail. Here, those deficiencies were the moving force behind Plaintiff's brutal beating and his ultimate injuries.

-42-

164. There are no areas in the Jail assigned to violent or non-violent pretrial detainees or particular categories of offenses. A wide variety of pretrial detainees are housed in particular areas, like 3 Cell, casting serious doubt as to the success of any efforts to separate violent from non-violent inmates.

165. There is a widespread failure to separate non-violent pretrial detainees from violent inmates. Pretrial detainees charged with or convicted of non-violent offenses with relatively low bonds, convicted of non-violent misdemeanors, pretrial detainees charged with extremely serious and violent crimes with high bonds and individuals convicted of one or more serious violent crimes are indiscriminately distributed throughout the Jail.

166. Under the current "system," Jail officials do not obtain or utilize much information pertinent to a determination of whether an inmate is violent or non-violent. Thus, there is no effective separation of violent and non-violent pretrial detainees.

167. Pretrial detainees are exposed to constitutionally-impermissible violence and threat of personal harm in violation of their Fourteenth Amendment rights. Jail records, inmate statements, and statements of County officials reveal that violence within the Jail is pervasive and a very serious problem. This increasing level of violence is attributable to a number of root causes, including:

■ severe overcrowding (crowding increases contact between people and thus provides opportunities and incentives to violent behavior);

■ lack of staff to observe inmate-behavior (number of corrections officers is inadequate for Jail, as officers leave the Jail largely unattended and cannot check on and supervise inmates, staff turnover is exceedingly high, and staff is largely inexperienced); and

■ a non-existent or inadequate classification system (inmates housed indiscriminately in each cell, regardless of their crimes or status).

-43-

168.     Here, the County, Sheriff Ball, and Chief Hartsell made an intentional decision with respect to the conditions under which Plaintiff was confined. Those conditions subjected Plaintiff to a substantial risk of serious harm. For reasons unexplained, the County failed to take any reasonable measures to abate the risks to Plaintiff and similar inmates, even though any reasonable officer would have appreciated the high degree of risk involved under the circumstances – making the consequences of Defendants' conduct obvious. By not taking such measures, the County caused Plaintiff to suffer serious injuries.

169.     These historical acts or omissions – regarding chronic overcrowding and under-staffing, regarding the hiring of unqualified Jail staff, regarding the failure or inability to classify inmates or segregate violent from non-violent pretrial detainees, and regarding the failure to post sufficient corrections-staff in the Jail – are indicative of a custom, policy, or practice of deliberate indifference to inmate safety at the Jail.

170.     The County maintained a policy and practice of overcrowding and inadequate supervision at the Jail that allow for inmate-on-inmate violence. This policy was a moving force behind the constitutional violation alleged herein.

171.     But for these unconstitutional customs, policies, or practices, Sheriff Ball, Chief Hartsell, and Correction Officers would not have exhibited deliberate indifference to Plaintiff's safety during his incarceration, but would have addressed the inmate overcrowding and under-staffing problems, would have hired qualified individuals supervise inmates, would have made sure Plaintiff was properly classified (instead of being housed in a cell with violent offenders), and would have posted sufficient corrections-staff inside the Jail to monitor and/or supervise inmates.

-44-

172.    In this case, the policy, practices, customs, and procedures of the County, as described herein, were substantial factors in the violation of Plaintiff's rights and the serious injuries suffered by him.

173.    For all of these reasons, the County has abdicated its governmental responsibilities to provide a safe and secure incarceration environment to pretrial detainees.

174.    As a direct and proximate result of the foregoing acts or omissions of the County, Plaintiff and other pretrial detainees have suffered serious injuries.

175.    Plaintiff therefore seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

## COUNT FOUR

### VIOLATION OF 42 U.S.C. § 1983
### FAILURE TO TRAIN UNDER THE FOURTEENTH
### AMENDMENT TO THE UNITED STATES CONSTITUTION

#### (Against Cocke County, Sheriff Ball, and Chief Hartsell)

176.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-113, as if fully set forth herein.

177.    The County, Sheriff Ball, and Chief Hartsell had a duty to train and supervise Corrections Officers.

178.    The County, Sheriff Ball, and Chief Hartsell failed to adequately train their Corrections Officers. They failed to properly train and supervise Sgt. Kirkland and Officers Bococke and Broyles, as well as other Corrections Officers, to classify inmates and segregate violent pretrial detainees from non-violent pretrial detainees. They also failed to properly train and supervise Corrections Officers to segregate intoxicated pretrial detainees from the general inmate population.

-45-

They further failed to properly train and supervise Corrections Officers to monitor inmates remotely and/or to perform regular and routine security checks.

179.     Sheriff Ball and Chief Hartsell are supervisory officials and were authorized and responsible for development and implementation of Jail policies and procedures to supervise and protect pretrial detainees. By their acts and omissions, Sheriff Ball and Chief Hartsell established the customs, policies and practices, as described above.

180.     The County's policies and practices were deliberately indifferent to the constitutional rights of its pretrial detainees under the Fourteenth Amendments.

181.     As supervisory law enforcement officials, Sheriff Ball and Chief Hartsell were well aware that the (a) failure to have a meaningful or adequate classification and/or segregation system and the (b) failure to monitor inmates remotely and/or perform regular and routine security checks would result in increased instances of inmate-on-inmate assaults, like the assault on Plaintiff, and serious injuries to inmates victimized by such assaults. Yet, Sheriff Ball and Chief Hartsell created a substantial risk of harm to Plaintiff and other pretrial detainees by implementing, ratifying, or otherwise condoning policies, practices, and/or customs that deprived Plaintiff of his right to be free from physical assault while incarcerated in the Jail.

182.     Here, the need for training is so obvious such that it equates to deliberate indifference to the Fourteenth Amendment rights of pretrial detainees. The brutal assault on Plaintiff by Inmates Webster and Moss is representative of a situation likely to recur at the Jail without proper and adequate training or supervision. It is, after all, predictable that an officer lacking specific tools to

handle that situation will violate citizens' rights. An inmate-on-inmate assault was a predictable result of Sheriff Ball and Chief Hartsell's failure to train correctional staff in classification techniques, to monitor inmates remotely and/or to perform regular and routine security checks.

183.    The County, Sheriff Ball, and Chief Hartsell failed to create and implement sufficient policies and procedures to protect vulnerable pretrial detainees and to ensure adequate training. They further failed to provide proper staffing, supervision, and discipline of employees in order to prevent deliberate indifference to the safety of pretrial detainees, as occurred here. The resulting policy, practice, of custom was one of indifference to the safety and protection of non-violent, intoxicated, disabled, or otherwise vulnerable pretrial detainees from violent inmates.

### *Defacto Policy, Practice, or Custom*

184.    The County, Sheriff Ball, and Chief Hartsell had a duty of care to Plaintiff and other non-violent, intoxicated, disabled, or otherwise vulnerable pretrial detainees to ensure that Corrections Officers were properly trained to protect them. The duty extends to ensure that supervisory officers are properly trained not to overlook or condone unnecessary and unreasonable deprivations of inmate safety protocols. These duties were all breached, as described herein.

185.    The County, through its policies and procedures, has failed to adequately train and supervise its officers to keep vulnerable pretrial detainees safe.

186.    By ratifying the acts or omissions of Sgt. Kirkland and Officers Bococke and Broyles and others, Sheriff Ball and Chief Hartsell acquiesced in their unconstitutional conduct through the execution of their own job functions.

187.    The County has failed to develop and implement a lawful policy of protecting pretrial detainees from assault and failed to train its officers and agents in the proper manner in which to do

-47-

so. No such policy exists, and if it does, it is so ineffectual as to be tantamount to no policy at all. The County's failures to develop lawful policies for the appropriate provision of safety and to properly train officers to follow such guidelines constitute deliberate indifference to the Fourteenth Amendment rights of Plaintiff and other pretrial detainees.

188.    The actions of Sgt. Kirkland and Officers Bococke and Broyles, in view of the repeated failures of TCI inspections and re-inspections, evidence a complete lack of training as to the proper method to protect pretrial detainees from violence. The failure of Sheriff Ball and Chief Hartsell to recognize or appreciate the gravity of such actions implies that they, too, found no wrong in the conduct, giving officers the "green light" to violate the civil rights of pretrial detainees.

189.    Official policy usually exists in the form of written statements, ordinances, or regulations, but it may also arise in the form of a widespread practice so common and well-settled as to constitute a custom that fairly represents a policy. Prior to the assault on the Plaintiff, the County had developed and maintained a *defacto* policy, custom, or practice exhibiting deliberate indifference to the safety of non-violent, intoxicated, or disabled pretrial detainees.

190.    Here, the Corrections Officers rightly believed their actions would not be properly monitored or corrected by supervisory officers and that their misconduct would be tolerated and accepted. The County established, by custom and usage, a de facto policy of allowing the unnecessary/unreasonable deprivations to go unchecked.

191.    As a direct and proximate result of the foregoing acts or omissions of the County, Sheriff Ball, and Chief Hartsell, Plaintiff suffered serious injuries.

192.    Plaintiff seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs of this action, and discretionary costs.

-48-

**COUNT FIVE**

**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

**(Against Sheriff Ball, Chief Hartsell, Sgt. Kirkland,
and Officers Bococke and Broyles, Individually)**

193.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-113, as if fully set forth herein.

194.    Having taken Plaintiff into custody, depriving him of his normal opportunities for protection, Sheriff Ball, Chief Hartsell, Sgt. Kirkland, and Officers Bococke and Broyles ("the Individual Cocke County Defendants") had a special relationship with Plaintiff under Tennessee law, creating an affirmative duty requiring Defendants to protect Plaintiff from foreseeable harm.

195.    The Individual Cocke County Defendants owed a duty to Plaintiff to use due care in fulfilling their duties and to ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted law enforcement standards so as not to cause him harm or injury.

196.    The County had a statutory and constitutional duty to maintain the Jail to secure the safe custody, health, and comfort of inmates it housed. Tenn. Code Ann. §§ 5-7-104 and 106. Sheriff Ball and Chief Hartsell – in direct and administrative control of the Jail – were obligated by law and had the requisite authority to protect Plaintiff and others incarcerated in the Jail.

197.    The County is legally liable for the non-negligent acts or failures to act of County deputies under Tenn. Code Ann. § 8-8-302, including gross negligence. It is also liable for the negligence of persons it employs, including Sheriff Ball, Chief Hartsell, Sgt. Kirkland, and Officers Bococke and Broyles, and other Jail employees, under Tenn. Code Ann. § 29-20-205.

-49-

198.    Sheriff Ball was responsible for the acts and omissions of his Corrections Officers, including their performance or failure to perform the tasks and duties that he was statutorily obligated to perform. *See* Tenn. Code Ann. § 41-4-101.

199.    As described above, the Individual Defendants breached their duty of due care and were negligent, grossly negligent, and/or reckless in all of the foregoing particulars.

### *Sheriff Ball, and Chief Hartsell*

200.    Sheriff Ball and Chief Hartsell were on notice that chronic overcrowding and understaffing at the Jail prevented pretrial detainees from being properly classified and housed according to the potential danger posed by other inmates.

201.    Despite being on notice – by TCI inspection reports, inmate assaults, lawsuits and other facts – of these critical deficiencies that put many pretrial detainees, particularly non-violent, intoxicated, or disabled pretrial detainees at a substantial risk of suffering serious harm, neither Sheriff Ball nor Chief Hartsell made any changes to Jail policies to abate or even ameliorate those risks. These vulnerable pretrial detainees, including the Plaintiff, were not segregated from violent inmates.

202.    Neither Sheriff Ball nor Chief Hartsell developed, implemented, or enforced a plan or policy to segregate non-violent pretrial detainees from violent inmates.

203.    As a result of the failure to reduce overcrowded, understaffed, and unsafe conditions, Plaintiff and other pretrial detainees were put in jeopardy by being housed with violent inmates who, on information and belief, are known to be violent inmates.

-50-

*Sgt. Kirkland and Officers Bococke and Broyles*

204.    For their part, Sgt. Kirkland and Officers Bococke and Broyles were responsible for classifying Plaintiff while he was in the custody of the Jail. They failed to classify Plaintiff – a non-violent, intoxicated, and disabled DUI offender – as a "minimum" custody level inmate and segregate him from known violent inmates, including Inmates Webster and Moss (Plaintiff's assailants).

205.    From their experience working at the Jail, including first-hand knowledge of daily inmate-on-inmate assaults, Sgt. Kirkland and Officers Bococke and Broyles knew that placing the non-violent, intoxicated, and disabled Plaintiff – in-custody on a DUI charge – in a cell with violent inmates would likely pose a substantial risk to Plaintiff's safety.

206.    The absence of a "drunk tank" in which to place pretrial detainees who arrive at the Jail under the influence of alcohol or drugs presents a very real threat to the security and safety of both the intoxicated pretrial detainees and other inmates. The failure of Jail officials to provide the Plaintiff with an environment that does not impair his physical and mental well-being is negligent or gross negligence.

207.    Despite this, Officer Bococke, the booking officer, and Sgt. Kirkland, the supervisor, assigned Plaintiff to Webster and Moss's cell, and Officer Broyles escorted him to 3 Cell, where Inmates Webster and Moss laid in wait for him as he used the toilet, and assaulted him within two minutes of him entering 3 Cell.

208.    Both Inmate Webster and Inmate Moss had been confined in the Jail since May 2023, and the Officers knew – or should have known – their violent criminal histories.

-51-

209. Sgt. Kirkland's conversation with Inmate Webster after he pulled him out of 3 Cell following the aggravated assault indicated that Kirkland was well aware that Webster was a particularly violent inmate and troublemaker and that Webster had assaulted other inmates on previous occasions since May 2023. Specifically, Sgt. Kirkland said to Webster, "What did I always tell you? If shit goes down get me back here before you do shit like this!"

210. As for Officer Broyles, after he opened the door to 3 Cell (to let Plaintiff into the cell) and began walking back to the control room, the Hall Video/Audio indicates that Officer Broyles heard a commotion in 3 Cell (as Inmates Webster and/or Moss began yelling at and/or threatening Plaintiff). Broyles returned to the door of 3 Cell, apparently to check on Plaintiff, before walking back to the control room. As he did so, in-cell video of 3 Cell shows that Inmates Webster and Moss were lying in wait for Plaintiff – in full-view of Broyles, who would have had a clear view of that portion of 3 Cell. But Broyles did nothing to protect Plaintiff from harm.

211. Similarly, as the commotion began to stir in 3 Cell, Officer Bococke walked down the hallway adjacent to 3 Cell. Video shows that she hesitated – at least twice – after hearing Inmates Webster and Moss yelling at and/or threatening Plaintiff, who had just entered 3 Cell seconds earlier and was using the toilet there. Bococke likely overheard the initial seconds of the assault.

212. Yet, hearing all this, Officer Bococke still did nothing. She did not look into 3 Cell. She did not check on what was happening in 3 Cell. Worse still, although a video camera in 3 Cell offered a live, real-time view of what was happening in 3 Cell, Officer Bococke did not even check the control room video monitor after she had heard the commotion in 3 Cell.

213.    In fact, all three Correction Officer Defendants – Sgt. Kirkland and Officers Bococke and Broyles – had ample opportunity to watch and hear the incident as it unfolded on the control room video monitor(s), to appreciate the perilous position they had created for the Plaintiff, and to prevent or at least interrupt the assault. But none of them did so.

214.    For all these reasons, Sgt. Kirkland and Officers Bococke and Broyles were grossly derelict in their duty to protect Plaintiff from the foreseeable harm of an inmate assault.

215.    As a direct and proximate result of the conduct of Sheriff Ball, Chief Hartsell, Sgt. Kirkland, and Officers Bococke and Broyles, as alleged above, and other undiscovered negligent or grossly negligent conduct, Plaintiff was caused to suffer serious bodily injuries and severe pain and suffering, entitling him to recover compensatory damages for such damages.

## COUNT SIX

### RECKLESS INFLICTION OF EMOTIONAL DISTRESS
### (Against Sgt. Kirkland, Individually)

216.    Plaintiff incorporates by reference the allegations in Paragraph Nos. 1-113, as if fully set forth herein.

217.    The actions alleged in Paragraph Nos. 1-113 against Sgt. Kirkland were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard to the probability of causing Plaintiff to suffer severe emotional distress.

218.    The conduct of Sgt. Kirkland, supra, was perpetrated with reckless disregard of the probability of inflicting mental anguish on Plaintiff. He knew, or should have known, that his actions in placing Plaintiff in a situation whereby his very life was endangered would result in serious injuries and severe emotional distress to Plaintiff.

-53-

219.     As a result of the assault, Plaintiff has suffered severe headaches, stress and anxiety, unwanted memories of the assault, irritability, hyper-vigilance, loss and fear of sleep, and other symptoms of Post-Traumatic Stress Disorder ("PTSD").

## VIII. PUNITIVE DAMAGES

### (Against Sgt. Kirkland)

220.     As described in detail in Paragraph Nos. 1-113 and 217-219, Sgt. Kirkland's acts were reckless and oppressive, and require the imposition of punitive damages against him in an amount deemed sufficient to punish and deter others in similar positions of authority from engaging in similar conduct in the future.

## IX. JURY DEMAND

221.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## X.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.     That Defendants be served with a copy of this Complaint and be required to answer;

B.     That this action may proceed as a class action against Cocke County, Sheriff Ball, and Chief Hartsell on the 42 U.S.C. § 1983 claims for deliberate indifference – based upon jail conditions and failure to train – with Plaintiff as the designated Class representative and Plaintiff's counsel as Class Counsel;

C.     That the Court find that Cocke County – and each of the Individual Defendants (on Plaintiff's individual claims) –  engaged in the unconstitutional conduct and statutory and common law violations alleged herein;

-54-

D.      That Plaintiff and/or the Class recover compensatory and punitive damages against Cocke County in an amount to be determined at trial, as provided by federal and Tennessee law, and that a judgment in favor of Plaintiff and/or the Class and against Cocke County be entered in the appropriate amount as shown at trial;

E.      That Plaintiff also recover compensatory damages from the Individual Defendants on his claim against them, in the sum of $500,000, as provided by federal and Tennessee law, jointly and severally, and that a judgment in his favor be entered against the Individual Defendants in an appropriate amount, as shown at trial;

F.      That Plaintiff also be awarded punitive damages against Sgt. Kirkland on his claim for reckless infliction of emotional distress in the sum of $500,000 or an appropriate amount, sufficient to deter similar conduct in the future;

G.      That Plaintiff and/or the Class have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by 42 U.S.C. § 1988 and other federal law; and

H.      That Plaintiff and/or the Class be awarded post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

-55-

Respectfully submitted, this 8th day of June, 2024.

/s/ Lance K. Baker
Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

*Counsel for Plaintiff*